UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------X
                                       :

24 SEVEN, LLC                            :
                                         :
                    Plaintiff,    :

             - against -          :

                                         :

EMILY PIROZZI MARTINEZ and THE  :
AGENCY WORX, LLC,               :
                                         :
                    Defendants.  :
                                         :
---------------------------------------------------------X

19-CV-7320 (VSB)

**OPINION & ORDER**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _1/26/2021_

<u>Appearances</u>:

Richard M. Reice
Kathryn T. Lundy
Michelman & Robinson, LLP
New York, NY
*Counsel for Plaintiff*

Marc S. Wenger
Adam G. Guttell
Alexandra T. Faver
Jackson Lewis P.C.
Melville, NY
*Counsel for Defendant Emily Martinez*

Jeffrey A. Miller
Michael J. Gelfand
Philip J. Campisi, Jr.
Westerman, Ball, Ederer, Miller & Sharfstein, L.L.P.
Uniondale, NY
*Counsel for Defendant The Agency Worx, LLC*

VERNON S. BRODERICK, United States District Judge:

Before me are the motions of Defendants Emily Pirozzi Martinez ("Martinez") and The Agency Worx, LLC ("Agency Worx") (collectively, "Defendants") to dismiss the complaint of Plaintiff 24 Seven, LLC ("24 Seven") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, (Docs. 27 and 30), and Plaintiff's motion for reconsideration of the August 19, 2019 Order issued by Judge Jed S. Rakoff denying Plaintiff's application for a preliminary injunction, pursuant to Local Rule 6.3, (Doc. 25). Because Plaintiff fails to plausibly allege that the information at issue constitute trade secrets, the Defend Trade Secrets Act claim is DISMISSED, and supplemental jurisdiction over the remaining state law claims is declined. Because Plaintiff fails to meet the standard for a motion to reconsider, Plaintiff's motion for reconsideration is DENIED. In addition, because Plaintiff fails to attach its proposed amendments, let alone demonstrate how any amendments would cure the defects in its complaint, Plaintiff's motion for leave to amend its complaint is DENIED.

## I.    **Factual Background**

Plaintiff 24 Seven brought this action against Defendants Emily Martinez and Agency Worx on August 6, 2019, alleging that Martinez violated her contractual obligations under a November 16, 2017 Restrictive Covenant between Martinez and 24 Seven (the "Covenant") by (1) joining Agency Worx, a direct competitor of 24 Seven, immediately after her resignation from 24 Seven, and continuing to call on and service national accounts and accounts within New York, New Jersey and Connecticut; (2) misappropriating and transmitting 24 Seven's confidential information to her personal Gmail account and disclosing this information to Agency Worx; and (3) soliciting business from customers of 24 Seven in her role at Agency Worx. (Compl. ¶ 1.)

24 Seven and Agency Worx are staffing agencies that place job candidates with employers.  24 Seven hired Martinez on January 22, 2010 as a business development manager. (*Id*. at ¶ 12.)  In September 2017, Martinez requested permission to (1) relocate to Pittsburgh, Pennsylvania, (2) work remotely, and (3) report to the New York office.  (*Id*. at ¶ 14.)  On November 16, 2017, Martinez executed the Covenant, which was an updated version of the original restrictive covenant she executed around the time of her hiring.  (*Id*. at ¶ 15; *see* Gudas Aff. Ex. 4.)  Pursuant to the Covenant, Martinez agreed she would not:  (1) use or disclose 24 Seven's confidential information during her employment and for a period of twenty-four months after the end of her employment; (2) "become employed by or enter into a business arrangement of any kind with a competitor pursuant to which she would continue to call-on and service national accounts or accounts within the New York metropolitan area" during her employment and for a period of six months after the end of her employment; or (3) solicit or accept business from "any person or firm which was a customer of 24 Seven at any time during [her] employment that was serviced by or assigned to [her] in whole or in part or seek to have any such customer divert his patronage, in whole or in part, from 24 Seven to any other person or firm" during her employment and for a period of twelve months after the end of her employment. (*Id*. at ¶¶ 15, 25, 23, 31; Gudas Aff. Ex. 4, at ¶¶ 6–9; 2–4; 11–12.)  In addition, Martinez agreed to return any confidential information and all other materials belonging to 24 Seven immediately upon the termination of her employment.  (Gudas Aff. Ex. 4, at ¶¶ 13–14).

Martinez resigned by email on July 9, 2019 without giving 24 Seven prior notice. (Compl. ¶¶ 18–20; *see* Gudas Aff. Ex. 5.)  On the same day, Chief Counsel of 24 Seven, Evan Lupion, sent Martinez a letter reminding her of her "continuing post-employment obligations to the Company" as outlined in the Covenant.  (Compl. ¶ 20; *see* Gudas Aff. Ex. 5.)  On July 26,

2019, Mr. Lupion sent Alicia Fazio, President of Agency Worx, a letter informing Fazio of Martinez's obligations under the Covenant.  (Compl. ¶ 29.)

On or about September 13, 2018, Martinez sent to her Gmail account a statement containing client names, candidate names, client contacts, revenues by client, and commission amounts.  (*Id.* at ¶ 34.)  In March 2019, Martinez sent information about the top ten accounts she managed and their staffing to her Gmail account.  (*Id.*; *see* Gudas Aff. Ex. 6.)  Martinez called 24 Seven's client, Intermix, at least three times and left messages imploring the client's representative to call her back.  (Compl. ¶ 35.)  Agency Worx, through Fazio, reached out to Intermix by email to announce that Martinez had joined the company.  (*Id.*)

Plaintiff alleges misappropriation and retention of 24 Seven's confidential, proprietary, and trade secret information by both Defendants in violation of the Defend Trade Secrets Act ("DTSA") and common law (**Counts I and V**); unlawful solicitation of 24 Seven's customers by both Defendants rising to a breach of contract (**Count II**), breach of the implied duty of good faith and fair dealing (**Count III**), and breach of duty of loyalty (**Count IV**); tortious interference with 24 Seven's contract with Defendant Martinez against Agency Worx (**Count VI**); and tortious interference with business relationships against both Defendants (**Count VII**).  Plaintiff seeks compensatory damages, punitive damages, attorneys' fees and costs, and to enjoin Defendants from unfairly competing, further exploiting 24 Seven's confidential information, and soliciting 24 Seven's customers and employees.  (*Id.* at 18.)

## II.   **Procedural History**

Plaintiff filed its complaint and motion for injunctive relief on August 6, 2019.  (Docs. 1, 5.)  On August 8, 2019, Judge Jed S. Rakoff (Part I) granted Plaintiff's motion for a temporary restraining order against Defendants.  (Doc. 6.)  On August 16, 2019, Judge Rakoff held a

hearing on whether the temporary restraining order should be changed into a preliminary

injunction.  (Doc. 32, Hr'g Tr. 2:19–21.)[1]  On August 19, 2019, Judge Rakoff denied Plaintiff's

motion for a preliminary injunction ("August 19 Order").  (Doc. 22.)

On August 29, 2019, Plaintiff submitted a proposed Order to Show Cause why an order

granting Plaintiff leave to reargue its motion for a preliminary injunction should not issue, (Doc.

25), which I construed as a motion for reconsideration or re-argument pursuant to Local Rule

6.3, (Doc. 34).  Defendants Agency Worx and Martinez accordingly submitted their oppositions

to Plaintiff's motion on September 27, 2019.  (Docs. 39, 40.)  Plaintiff filed its reply on October

4, 2019.  (Doc. 42.)

On September 6, 2019, Defendants Agency Worx and Martinez filed the instant motions

to dismiss Plaintiff's Complaint.  (Docs. 27–29; 30–31.)  On October 9, 2019, Plaintiff filed its

memorandum of law in opposition to the Defendants' motions to dismiss.  (Doc. 43, Pl.'s Opp.

Mem.)[2]  On October 23, 2019, Defendants Martinez and Agency Worx filed their replies.  (Docs.

44, 45.)

### III.   Legal Standards

#### A.   *Rule 12(b)(6)*

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a

complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007)).  A claim will have "facial plausibility when the plaintiff

---

[1] "Hr'g Tr." refers to the transcript of the preliminary injunction hearing held on August 16, 2019 before Judge Jed Rakoff, entered September 10, 2019.  (Doc. 32.)

[2] "Pl.'s Opp. Mem." refers to Plaintiff's omnibus memorandum of law in opposition to the Defendants' motions to dismiss, filed October 9, 2019.  (Doc. 43.)

pleads factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged." *Id.*  This standard demands "more than a sheer possibility

that a defendant has acted unlawfully." *Id.*  "Plausibility . . . depends on a host of considerations:

the full factual picture presented by the complaint, the particular cause of action and its elements,

and the existence of alternative explanations so obvious that they render plaintiff's inferences

unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

In considering a motion to dismiss, a court must accept as true all well-pleaded facts

alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor. *Kassner*

*v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).  A complaint need not make

"detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a

formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (internal

quotation marks omitted).  Finally, although all allegations contained in the complaint are

assumed to be true, this tenet is "inapplicable to legal conclusions." *Id.*  A complaint is "deemed

to include any written instrument attached to it as an exhibit or any statements or documents

incorporated in it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir.

2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir.

1995)).  "Even where a document is not incorporated by reference, the court may nevertheless

consider it where the complaint 'relies heavily upon its terms and effect,' which renders the

document 'integral' to the complaint." *Id.* at 153 (quoting *Int'l Audiotext*, 62 F.3d at 72).

### B. *Local Rule 6.3*

Local Civil Rule 6.3 allows reconsideration or reargument of a court's order in certain

limited circumstances.  The decision of whether to grant or deny a motion for reconsideration is

"within 'the sound discretion of the district court.'" *Premium Sports Inc. v. Connell*, No. 10 Civ.

3753 (KBF), 2012 WL 2878085, at *1 (S.D.N.Y. July 11, 2012) (quoting *Aczel v. Labonia*, 584 F.3d 52, 61 (2d Cir. 2009)).

The standard for reconsideration "is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked— matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). Generally, a party seeking reconsideration must show either "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *In re Beacon Assocs. Litig.*, 818 F. Supp. 2d 697, 702–03 (S.D.N.Y. 2011) (quoting *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 154 F. Supp. 2d 696, 701 (S.D.N.Y. 2001)); *see also Lichtenberg v. Besicorp Grp. Inc*., 28 F. App'x 73, 75 (2d Cir. 2002) (stating that the movant "must demonstrate that the Court overlooked controlling decisions or factual matters that were put before the Court on the underlying motion" in order to prevail on a motion for reconsideration). A motion for reconsideration is "neither an occasion for repeating old arguments previously rejected nor an opportunity for making new arguments that could have been previously advanced." *Associated Press v. U.S. Dep't of Def.*, 395 F. Supp. 2d 17, 19 (S.D.N.Y. 2005). Nor is a motion for reconsideration a time to "advance new facts, issues or arguments not previously presented to the Court." *Pettiford v. City of Yonkers*, No. 14 CIV. 6271 (JCM), 2020 WL 1989419, at *2 (S.D.N.Y. Apr. 27, 2020) (citing *McGee v. Dunn*, 940 F. Supp. 2d 93, 100 (S.D.N.Y. 2013) (internal citations omitted)).[3]

---

[3] "[O]nly when evidence is truly newly discovered does it become a proper grounds for a motion for reconsideration." *Pettiford v. City of Yonkers*, No. 14 CIV. 6271 (JCM), 2020 WL 1989419, at *2 (S.D.N.Y. Apr. 27, 2020) (quoting *Atlantic States Legal Foundation, Inc. v. Karg Bros*., Inc., 841 F. Supp. 51, 56 (N.D.N.Y. 1993)). To be considered "newly discovered," evidence must have "truly [been] newly discovered or could not have been found by due diligence," and "must not have been available prior to entry of the judgment leading to reconsideration." *Id.* (internal quotations omitted).

IV.   **Discussion**

A.   *Defendants' Motions to Dismiss*

Defendant Agency Worx moves the Court to: (1) dismiss the first and fifth causes of action as barred by collateral estoppel, (Doc. 29, Def. Worx's Mem. 4, 10);[4] (2) dismiss and decline to exercise supplemental jurisdiction over 24 Seven's state law claims, (*id.* at 8); (3) dismiss the sixth cause of action on the basis that the Covenant with Defendant Martinez is unenforceable and cannot serve as the basis for a claim of tortious interference with a contract, (*id.* at 12); and (4) dismiss the seventh cause of action for failure to state a claim, (*id.* at 12). Defendant Martinez incorporates the arguments set forth in Defendant Agency Worx's memorandum, and additionally moves to dismiss the first and eighth causes of action for failure to state a claim under DTSA and New York law, and requests that I decline to exercise supplemental jurisdiction over 24 Seven's state law claims.  (Def. Martinez's Mem. 6, 13.)[5]

1.   **Plaintiff's DTSA Claim**

a.   Applicable Law

To plead misappropriation of a trade secret under the DTSA, 18 U.S.C. § 1832, *et seq.*, a plaintiff must show "an unconsented disclosure or use of a trade secret by one who (i) used improper means to acquire the secret, or, (ii) at the time of disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such a duty."  *In re Document Techs. Litig.*, 275 F. Supp. 3d 454, 462 (S.D.N.Y. 2017)

---

[4] "Def. Worx's Mem." refers to Defendant Agency Worx's memorandum of law in support of its motion to dismiss, filed September 6, 2019.  (Doc. 29.)

[5] "Def. Martinez's Mem." refers to Defendant Emily Martinez's memorandum of law in support of her motion to dismiss, filed September 6, 2019.  (Doc. 31.)

(quoting 18 U.S.C. § 1839(3) (A)–(B)).  Similarly, under New York law, "a party must

demonstrate:  (1) that it possessed a trade secret, and (2) that the defendants used that trade secret

in breach of an agreement, confidential relationship or duty, or as a result of discovery by

improper means."  *Id*. at 461–62 (citing *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 43–44

(2d Cir. 1999)).[6]

A "trade secret" includes "all forms and types" of information that "derives independent

economic value . . . from not being generally known to, and not being readily ascertainable

through proper means by, another person who can obtain economic value from the disclosure or

use of the information," and that the owner of which took "reasonable measures" to keep secret.

18 U.S.C. § 1839(3).  New York courts generally adopt the six-factor test articulated in the First

Restatement of Torts to determine whether information constitutes a trade secret under either the

DTSA or state law, assessing

> (1) the extent to which the information is known outside of the business; (2) the
> extent to which it is known by employees and others involved in the business; (3)
> the extent of measures taken by the business to guard the secrecy of the information;
> (4) the value of the information to the business and its competitors; (5) the amount
> of effort or money expended by the business in developing the information; (6) the
> ease or difficulty with which the information could be properly acquired or

---

[6] The Covenant's characterization of "Confidential Information" is notably broader than the definition of "trade secrets" under the DTSA:

> Employee acknowledges that 24 SEVEN has, through the expenditure of considerable time and
> expense over the course of many years, developed extensive confidential and secret information,
> whether on written lists, computer disks, computer print-outs or hard copy documents, regarding (a)
> its customers' names, addresses, preferences, seasonal and other business cycles, buying patterns,
> pricing and discounting, key contact personnel, special requirements, financial and/or contractual
> relations, job orders, requisitions bids and bidding practices, and related information; (b) its
> applicants or candidates, including their names, home telephone numbers, addresses, skills, abilities,
> test results, evaluations, work history, pay rates, and related policies, and (c) various documents
> containing information relating to the Company's recruiting, training, operating, advertising and
> marketing financial policies and practices, financial information and other non-publicly disclosed
> financial information (hereafter) collectively referred to as the "Confidential Information").

(Gudas Aff. Ex. 4 ¶ 6.)  Accordingly, in determining whether the information at issue constitutes a trade secret, I am
guided by the DTSA's definition and related caselaw, rather than the Covenant's depiction.

duplicated by others.

*Ashland Management Inc. v. Janien*, 82 N.Y. 2d 395, 407 (1993) (quoting Restatement of Torts § 757 cmt. B (internal quotation marks omitted)).

b.  Application

For purposes of the instant motions to dismiss, I assume the facts alleged in Plaintiff's complaint to be true.  Moreover, while I am not required to accept as true documents not "incorporated by reference" by the complaint, *Chambers,* 282 F.3d at 153, I also assume the facts alleged in Plaintiff's application for a preliminary injunction, the supporting affidavit of Celeste Gudas, founder and CEO of 24 Seven, and accompanying exhibits to be true for purposes of these motions.

On or about September 13, 2018, Martinez sent a Commission Report "containing client names, candidate names, key client contacts, revenues by client and commission amounts" to her personal email account.  (Doc. 1, Compl. ¶ 34; Gudas Aff. Ex. 1.)[7]  This information allegedly took Plaintiff "years to develop," and included "who to contact, what [24 Seven] can charge, what margins allow [24 Seven] to both compete and to generate a profit, how much business [24 Seven does] with a given client, and the keys to [its] inventory."  (Gudas Aff. ¶ 23.)  On or about March 7, 2019, Martinez sent to her personal email account "account lists, plans and detailed information concerning 24 Seven's customers in 2018 and 2019."  (Compl. ¶ 26; Gudas Aff. Ex. 7.)  This included "information about the top 10 accounts she manages and information about their staffing" and 24 Seven's training materials.  (Compl. ¶ 34; Gudas Aff. Exs. 6, 9.)  In June 2019, Martinez also "systematically reviewed customer records through 24 Seven's customer

---

[7] "Compl." refers to Plaintiff's complaint filed August 6, 2019.  (Doc. 1.)  "Gudas Aff." refers to Celeste Gudas' affidavit in support of Plaintiff's motion for a temporary restraining order and preliminary injunction, filed August 6, 2019.  (Doc. 5.)

database, Bullhorn, concentrating on industries that she did not service." (Compl. ¶ 34.)[8]
Included in the information Martinez accessed in 24 Seven's Bullhorn database were "prior
contacts, key customer contact, and the temp jobs filled by 24 Seven" for a number of large
clients in the beauty and advertising industries. (Gudas Aff. ¶ 27; *see* Gudas Aff. Exs. 7, 8.) 24
Seven's email exchanges, work orders, and contracts with clients are also stored in the Bullhorn
database. (H'rg Tr. 7:17–21; *see* Gudas Aff. Ex. 8.) Martinez was able to view, for instance,
clients' preferred rates on the system. (*See* Gudas Aff. Ex. 8.) Since Martinez was not assigned
by 24 Seven to service clients in the beauty and advertising industries, (Gudas Aff. ¶ 27), but
nonetheless reviewed their files around the time of her resignation, Plaintiff surmises that she
had no legitimate business reason to conduct this review, (*id*.; H'rg Tr. 8:11–21).

Defendants argue that Plaintiff fails to state a claim under the DTSA because none of the
materials Martinez sent to her personal email account or the data that Martinez viewed on the
Bullhorn constitute trade secrets. (*See* Gudas Aff. Exs. 1, 6, 7, 8, 9.) Defendants also argue that,
even if the materials were trade secrets, 24 Seven fails to plausibly allege that Martinez used or
disclosed its information or that Martinez obtained its information through improper means.

Since Plaintiff's DTSA claim must fail if none of the information raised in the pleadings
amount to trade secrets, I will begin with my inquiry with this gating issue.

          i.     *Customer Data on the Commission Report, Account Lists,
and 24 Seven's Bullhorn Database*

Because the Commission Report, the account lists, and the data Martinez viewed on
Bullhorn contain the same types of allegedly protected information, I will address them together.

---

[8] Bullhorn is an applicant tracking software platform that is "used by many staffing agencies in the industry,
including Agency Worx." (Doc. 17, Fazio Aff. at ¶ 24; Doc. 18, at 13). "Fazio Aff." refers to Alicia Fazio's
affidavit in opposition to Plaintiff's motion for a preliminary injunction, filed August 16, 2019. (Doc. 17.)

The Commission Report in question is a spreadsheet detailing the names of clients, their respective company contacts, candidate names, "compensation figures, hours worked, commission revenues," and "markup determinations."  (Pl.'s Opp. 14; *see* Gudas Aff. Ex. 1.)  The account lists similarly contain the names of clients and company contacts, as well as Martinez's notes regarding particular clients' hiring requirements, processes, and point persons.  (*See* Gudas Aff. Ex. 6.)  The information Martinez viewed on the Bullhorn database contained customer contacts, lists of jobs filled by 24 Seven, prior email exchanges, work orders, and contracts with clients containing information such as clients' preferred rates.  (H'rg Tr. 7:17–21; *see* Gudas Aff. Ex. 8.)  In essence, three categories of information are at issue: (1) client and candidate names and contacts; (2) insight into particular clients' preferences; and (3) information about pricing and profit margins.

Defendants challenge Plaintiff's assertion that the above data is protected under the DTSA.  Defendants claim that all of the information in question is generally known to individuals outside of 24 Seven in the staffing industry.  (Def. Martinez's Mem. 7–8.)  Specifically, Defendants assert that the employers whose details are at issue are "large, global companies that do not have any exclusive relationship with 24 Seven," who "do business with staffing agencies all over the country," and whose identities and contacts are easily accessible online.  (*Id*. at 8; H'rg Tr. 11:18–21.)  Moreover, Defendants point out that the identities and profiles of the job candidates Plaintiff works with are not private for the likely reason that candidates have an interest in disseminating this information broadly.  (*Id*. at 9.)  Defendants claim that both candidate and customer information for these large employers is retrievable online and at trade shows.  (H'rg Tr. 14:4; Fazio Aff. ¶ 11.)  Agency Worx's President, Alicia Fazio, notes that, because employers wish to round up the best candidates for the best price,

"[o]nce contacted, these companies are happy to share with a staffing salesperson their pricing in connection with the recruitment and employment of candidates."  (Fazio Aff. ¶ 22.)  Martinez further notes that staffing agencies are "well aware of the margins [their] competitors use" and "frequently get that information directly from clients."  (Doc. 15, Martinez Aff. ¶ 9.)[9]

Plaintiff contends that, beyond job candidate and client names, the Commission Report and client lists contain protected information "like margins, key contacts, customer activity, customer preference, and all of that data is accumulated over time."  (H'rg Tr. at 4:13–15.)  Specifically, Plaintiff describes this information as "a tracking of historical data and figures relating to the interaction between candidates and customers and 24 Seven's role in developing that relationship."  (Pl.'s Opp. Mem. 13.)  This data, Plaintiff alleges, "is the result of processes in 24 Seven's regular business operations and consists of integral information compiled as a result of 24 Seven's continuous efforts to secure candidates, locate and cultivate relationships with key client personnel and, through the years, develop margins and pricing that allow it to gain a competitive advantage."  (*Id.* at 13–14.)  For example, Plaintiff states that getting to know the contact at a company's hiring department "who actually has the ability to issue a work order . . . can take years to develop."  (H'rg Tr. at 4:10–12.)  Such information is "not readily ascertainable by clicking on a candidate's LinkedIn profile or a customer's website."  (Pl.'s Opp. 14.)  Moreover, Plaintiff alleges that it "spends literally hundreds of thousands of dollars on recruiters, job fairs, advertising, industry events, and more to constantly source, vet, recruit and, at times, train candidates to ensure that it can provide highly skilled talent to its clients."  (Doc. 26, Pl.'s Recons. Mem. 2.)[10]

---

[9] "Martinez Aff." refers to Defendant Martinez's affidavit in support of her motion to dismiss filed August 15, 2019.  (Doc. 15.)

[10] "Pl.'s Recons. Mem." refers to Plaintiff's memorandum of law in support of its motion for reconsideration filed

Whether just the names of clients listed in the allegedly protected documents constitute trade secrets is not a complex question.  "[T]he *sine qua non* of whether a customer list constitutes a trade secret lies in whether 'the customers are readily ascertainable outside the employer's business as prospective users or consumers of the employer's services or products,' or, by contrast, 'the customers are not known in the trade or are discoverable only by extraordinary efforts [and the] customers' patronage had been secured by years of effort and advertising effected by the expenditure of substantial time and money.'"  *Poller v. BioScrip, Inc.*, 974 F. Supp. 2d 204, 216 (S.D.N.Y. 2013) (quoting *Leo Silfen, Inc. v. Cream,* 29 N.Y.2d 387, 392 (Ct. App. 1972)).  Where it "would be difficult to duplicate a customer list because it reflected individual customer preferences, trade secret protection should apply."  *Haber*, 188 F.3d at 46.  Here, it is clear from the record that the lists of candidates and customers are readily obtainable in the industry; therefore, I find that this information does not constitute a trade secret.  Indeed, Plaintiff specifically concedes that it is not seeking trade secret protection for "every client."  (*See* Pl.'s Opp. Mem. 10; H'rg Tr. 3:10–12 ("We don't stand before the court and claim that every client named is a trade secret, certainly not, because they are often public knowledge.").)  However, to the extent that the documents contain specific client names that are allegedly not public, Plaintiff fails to identify those clients so that I might address them individually.

Turning next to the contact information and customer preferences in the Report and account lists, (*see* Gudas Aff. Exs. 1, 6), the pleadings also do not demonstrate that this information rises to the level of a trade secret.  The contact information at issue includes the email addresses and phone numbers of the human resources managers to reach out to, while the

---

August 29, 2019.  (Doc. 26.)

alleged customer preferences include details such as employers' requirements as to candidates

and their specific interview processes.  (*See* Gudas Aff. Ex. 6).  As Defendants point out,

employer contact information is widely available online or through trade shows, (H'rg Tr. 14:4;

Fazio Aff. ¶ 11), and Plaintiff has put forth no evidence disputing this characterization.  With

regard to the information about customers' requirements and hiring processes, Plaintiff fails to

identify the specific client preferences that it claims Defendants have stolen.[11]  In any event,

even if it had, Plaintiff does not demonstrate that these preferences are distinct from the type of

knowledge that any staffing professional might pick up over a number of years working in the

industry.  Short of a showing by Plaintiff to the contrary, it not plausible to suggest that

employers are not forthcoming about these preferences when contacted by the staffing agencies

that they work with to hire candidates.  In fact, Plaintiff's claim to have invested money "on

recruiters, job fairs, advertising, industry events" only further supports the contention that these

details were publicly available.  (Pl.'s Recons. Mem. 2.)  As courts in this Circuit have

recognized, such openly communicated information does not warrant trade secret protection.

*See, e.g.*, *Ivy Mar Co. v. C.R. Seasons Ltd*., 907 F. Supp. 547, 558 (E.D.N.Y. 1995), *disapproved*

*of by Faiveley Transp. Malmo AB v. Wabtec Corp*., 559 F.3d 110 (2d Cir. 2009) (holding that

where "information concerning customer preferences and ordering patterns could easily be . . .

obtained by contacting those customers directly," that information could not be deemed a trade

secret); *Kadant, Inc. v. Seeley Mach., Inc*., 244 F. Supp. 2d 19, 36 (N.D.N.Y. 2003) (denying

trade secret protection to contacts information where customer companies' general contact

---

[11] "While neither the New York Court of Appeals nor the United States Court of Appeals for the Second Circuit has expressly required trade secrets to be identified with any particular degree of specificity, it is evident that a 'vague and indefinite' piece of information cannot be protected as a trade secret."  *Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 515 (S.D.N.Y. 2017) (citing *Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co*., 1 F.Supp.3d 224, 258 (S.D.N.Y. 2014)).

information was readily available and "follow-up questions to the company in general would reveal the specific names, e-mail addresses, or phone numbers of individuals involved in the purchasing process"); *see also Walter Karl, Inc. v. Wood*, 137 A.D.2d 22 (1988) (stating that "an employee's recollection of information pertaining to specific needs and business habits of particular customers is not confidential").

A similar analysis applies to the pricing information contained in the disputed documents, upon which the gross margins, revenues, and commission figures in the same documents appear to be based.  (*See* Gudas Aff. Ex. 1).  Although pricing information may constitute a trade secret under certain circumstances, *In re Dana Corp*., 574 F.3d 129, 152 (2d Cir. 2009), "this is generally where a company uses some type of proprietary formula that gives it a unique advantage, such as a complex pricing or trading algorithm in a financial business," *Free Country Ltd v. Drennen*, 235 F. Supp. 3d 559, 566–67 (S.D.N.Y. 2016); *see also Marietta Corp. v. Fairhurst*, 301 A.D.2d 734, 738, 754 N.Y.S.2d 62, 67 (2003) (holding that pricing information does not generally constitute trade secrets).  Conversely, price information relating to "underlying mechanics, such as the prices of materials and costs of manufacturing, are not trade secrets because 'any seller's publicly-available prices signal to competitors some information about the underlying mechanics of the seller's pricing structure.'"  *Drennen*, 235 F. Supp. 3d at 567 (quoting *Silipos, Inc. v. Bickel*, No. 1:06–CV–02205, 2006 WL 2265055, at *4–5 (S.D.N.Y. Aug. 8, 2006)).  Although Plaintiff states that it obtained the pricing information in the allegedly misappropriated documents through the "tracking of historical data," Plaintiff does not describe how its process is in any way proprietary or unique.  (Pl.'s Opp. Mem. 13.)  Nor does Plaintiff show that the underlying prices were gleaned through proprietary means.  Plaintiff does not raise any facts that contradict Defendants' description that prices could be obtained by contacting

companies and requesting this information, (*see* Fazio Aff. ¶ 22; Martinez Aff. ¶ 9), or refute an

inference that these price margins were an open secret in the industry by means of "any seller's

publicly-available prices," *Silipos*, 2006 WL 2265055, at *4–5.  Plaintiff also does not allege that

the pricing information is proprietary information that gives Plaintiff a competitive edge "over

competitors who do not know or use it."  *Restatement of Torts*, § 757, Cmt. b.  Rather, in a

competitive industry such as staffing, it seems far more plausible that "price decisions are made

on current competitive information which fluctuates over time," in which case 24 Seven's

outdated pricing and revenue data would be of scant value to a competitor today.  *Ivy Mar*, 907

F. Supp. at 558.  Because Plaintiff has made no showing to the contrary, I find that Plaintiff has

failed to state a claim that the pricing information at issue constitutes a trade secret.

       As the above discussion makes clear, Plaintiff fails to demonstrate that the allegedly

protected information in the Commission Report, accounts lists, and Bullhorn database was not

known outside of the staffing industry or by employees and others involved in the staffing

industry.  Plaintiff further does not establish that the information could not be easily acquired by

others in the industry.  In fact, Plaintiff's testimony itself suggests that the data was readily

available through recruiting, direct contact with employers, and trade fairs.  (*See* Pl.'s Recons.

Mem. 2.)  The first, second, and sixth factors of the Restatement test thus militate in Defendants'

favor.

       Plaintiff nonetheless alleges that it took reasonable measures to secure its information,

such as by forbidding its employees to use and disclose its confidential information, requiring all

employees to sign a confidentiality agreement and restrictive covenants, and restricting company

databases by assigning unique passwords to each employee.  (Compl. ¶¶ 23, 25, 31, 44.)  While

these measures may support the third Restatement factor, they are not dispositive in light of the

failings discussed above.  In any case, the pleadings do not lean uncontrovertibly in Plaintiff's

favor on this prong.  Although Plaintiff states that it made employees sign agreements to protect

its confidential information in general, Plaintiff nonetheless fails to make a particularized

showing that the precise documents and information at issue belonged to the set of data covered

by those agreements.  Moreover, although Plaintiff used unique passwords to secure access to its

database, Plaintiff does not allege that Martinez's access of Bullhorn to view client data was

improper or that it put in place security measures circumventing access to this data.  As such,

Plaintiff does not establish that it took measures to safeguard the secrecy of the particular

information at issue in this case sufficient to prevail under the third prong of the Restatement

test.

Although potentially relevant to the fifth Restatement factor, Plaintiff's argument that this

information was "compiled as a result of 24 Seven's continuous efforts to secure candidates,

locate and cultivate relationships with key client personnel and, through the years, develop

margins and pricing that allow it to gain a competitive advantage" is not dispositive.  (Pl.'s Opp.

Mem. at 13–14.)  The fact that compilation of these lists was an arduous task is not alone

sufficient to confer protection under the DTSA.  *See, e.g.*, *Webcraft Techs., Inc. v. McCaw*, 674

F. Supp. 1039, 1044–45 (S.D.N.Y. 1987) (finding that a customer list of prospective customers

"put together from easily available sources" may not have constituted a trade secret despite the

fact that "considerable work [went] into compilation of the list"); *Art & Cook, Inc. v. Haber*, 416

F. Supp. 3d 191, 196 (E.D.N.Y. 2017) (finding that "the fact that the contacts on [the plaintiff's]

customer lists are generally known within [the plaintiff's] industry is fatal" despite the plaintiff's

testimony that it spent "tens if not hundreds of hours" of research compiling these lists).  While

Plaintiff alleges that it expended significant resources on gathering this data, this fact does not

overcome the evidence that supports an inference that the data was publicly accessible to other

staffing agencies.  Nor does the mere fact that Plaintiff undertook the time and effort to develop

personal relationships with the contacts at issue transform the staffing preferences that these

contacts shared with Plaintiff into trade secrets, or establish that other staffing agencies were

precluded from gleaning such information from those clients.

As to the fourth Restatement factor, Plaintiff argues that its information is valuable "in

part because [it is] secret."  (Pl.'s Opp. Mem. 15.)  Plaintiff moreover argues that its time and

resources spent compiling this data demonstrate that 24 Seven derives economic value from the

information in question.  (*See id.*)  These arguments fail to carry Plaintiff's burden to establish

that the information at issue is a trade secret.  As discussed above, I have already rejected

Plaintiff's assertion that the data was in fact unavailable to the public.  Aside from pointing to its

expenditures, Plaintiff makes no other allegations as to the economic value of this information

vis-à-vis its competitors.  Plaintiff does not show that its efforts compiling these documents

translates to an independent economic advantage over its competitors or that other staffing

agencies would benefit from appropriating these lists from Plaintiff.  To the contrary, the record

suggests that because of the wide availability of this information, the economic edge that 24

Seven's reports would give competitors is marginal and would dissipate with the age of the

report.  Indeed, Fazio testifies that the information on the account lists "would be of no use to

Agency Worx" and that Defendant Agency Worx never used any of the information that

Martinez allegedly appropriated from 24 Seven.  (Fazio Aff. ¶ 23.)  In light of Plaintiff's failure

to plead plausible facts otherwise, Plaintiff's argument that the Report and account lists

constitute trade secrets under the fourth Restatement factor, simply because of its efforts to

compile and to safeguard this information, is insufficient and conclusory at best.

In sum, the balance of the factors in the Restatement test tip against Plaintiff's claim that the information in the Report, account lists, and data Martinez viewed on Bullhorn warrants trade secret protection under the DTSA.

ii.     *24 Seven's Employee Training Materials*

With respect to the 24 Seven training materials that Martinez sent to her personal account in June 2017, (Compl. ¶ 34; Gudas Aff. Ex. 9), Plaintiff fails to allege facts that support a determination or inference that any of the information in these materials warrants trade secret protection.  The training materials in question contain suggested scripts for calls with prospective clients.  (*See* Ex. 9 to Gudas Aff.)  Plaintiff does not suggest that the information in these materials was unavailable or unknown to employees or others outside of the business, that it invested significant resources in developing these materials, or that this information gave it an economic leg up "over competitors who do not know or use it."  *Restatement of Torts*, § 757, Cmt. B.  Nor, for that matter, does Plaintiff allege that Martinez used "improper means" to obtain these materials, *In re Document Techs. Litig.*, 275 F. Supp. 3d 454, 462 (S.D.N.Y. 2017), which appear to have been intended for distribution to Martinez's "team."  (*See* Ex. 9 to Gudas Aff. 2.) Absent any showing that these materials contained trade secrets, let alone that Martinez used this information for any improper purpose, Plaintiff may not seek damages from Martinez under the DTSA for sending herself company training manuals during the period of her employment.  *See, e.g.*, *Advance Biofactures Corp. v. Greenberg*, 103 A.D. 2d 834, 836 (2d Dep't 1984) ("an employee may not be restrained from using the general techniques learned during his employment"); *Sales Strategies Grp., Inc. v. Fenton*, 838 N.Y.S.2d 856, 858 (Sup. Ct. 2007) (denying trade secret protection to scripted sales pitches on the basis that "once they have been used, sales pitches are not treated as trade secrets").

Therefore, I find that none of the information in question constitute trade secrets under the DTSA.  Since Plaintiff's federal trade secret misappropriation claim fails on this ground, I do not reach the question of "whether the same or connected transactions are at issue and the same proof is needed to support the claims" in both the *O'Grady* case and the current suit, such that the latter is precluded by *res judicata*.  *Curtis v. Citibank, N.A.*, 226 F.3d 133, 139 (2d Cir. 2000).[12]  Plaintiff's DTSA claim is hereby DISMISSED.

### 2.  Plaintiff's State Law Claims

In addition to its claim under the DTSA, Plaintiff also asserts state law claims for trade secret misappropriation under New York common law, breach of contract, breach of the implied duty of good faith and fair dealing, breach of the duty of loyalty, tortious interference with contract, and tortious interference with business relationships.  Defendants move to dismiss Plaintiff's state law claims for lack of subject matter jurisdiction, based upon the failure to state a claim under the DTSA.  (Def. Martinez's Mem. 13; Def. Worx's Mem. 8.)  For the reasons set forth below, I decline to exercise supplemental jurisdiction over Plaintiff's state law claims and, therefore, dismiss them without prejudice pursuant to Rule (12)(b)(1) for lack of subject matter jurisdiction.

---

[12] Defendants separately argue that 24 Seven's DTSA claim is precluded by the New York County Supreme Court's decision in *24 Seven, Inc. v. O'Grady*, No. 652583/15, 2016 WL 3211217 (N.Y. Sup. Ct. June 09, 2016), where Plaintiff's DTSA claims against Agency Worx were summarily dismissed on those very grounds.  The *O'Grady* court stated that client identities that are "ascertainable outside the employer's business as prospective users or consumers of the employer's services or products" do not constitute trade secrets.  *Id*. at *4.  As the defendants established that the candidate and client information at issue was readily ascertainable through public sources since "all of the candidates' identifies and their pertinent qualifications were publicly accessible on professional networking websites" and "the client information was similarly accessible with little effort," the *O'Grady* court held that the information did not constitute a trade secret as a matter of law.  *Id*.  Although the *O'Grady* court's reasoning is relevant to the current decision, I do not decide whether as a matter of law it precludes Plaintiff's misappropriation claim.

a.   <u>Applicable Law</u>

Section 1367(c)(3) of title 28 provides that district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if "the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367.  Whether to exercise supplemental jurisdiction "is within the sound discretion of the district court."  *Lundy v. Catholic Health Sys. of Long Island Inc*., 711 F.3d 106, 117 (2d Cir. 2013) (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 349–50 (1988)).  Courts "consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity" to decide whether to exercise supplemental jurisdiction.  *Lundy*, 711 F.3d at 117–18.  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."  *Kolari v. New York-Presbyterian Hosp*., 455 F.3d 118, 122 (2d Cir. 2006) (citing *Cohill*, 484 U.S. at 350 n.7); *see also, e.g.*, *Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well."); *Principia Partners LLC v. Swap Fin. Grp*., LLC, No. 18 CIV. 7998 (AT), 2019 WL 4688711 (S.D.N.Y. Sept. 26, 2019) (declining to exercise supplemental jurisdiction over the plaintiff's state law claims pursuant to § 1367 after the plaintiff's DTSA claim was dismissed).

b.   <u>Application</u>

Plaintiff submits that I have subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1338 since Plaintiff's trade secret misappropriation claims arise under 28 U.S.C.A. § 1831, *et seq*.  (Compl. ¶ 9.)  Plaintiff maintains that I also have supplemental jurisdiction over 24 Seven's remaining claims under 28 U.S.C. § 1367.  (*Id.*)

Because I am dismissing Plaintiff's only federal claim, the balance of factors counsel in favor of declining supplemental jurisdiction.  Allowing Plaintiff to pursue its state law claims in state court would "avoid needless decisions of state law by this Court, which also promotes the interests of comity and justice."  *Moran v. Tryax Realty Mgmt, Inc*., No. 15 Civ. 8570, 2016 WL 3023326, at *4 (S.D.N.Y. May 23, 2016) (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)) (internal quotation marks omitted).  Concerns about judicial economy, convenience, and fairness are limited because discovery is not yet underway and a trial date has not been set.  *Cohill*, 484 U.S. at 350 n.7 ("[I]f the federal claims are dismissed before trial[,] the state claims should be dismissed as well." (internal quotation marks and citation omitted)).

Therefore, I decline to exercise supplemental jurisdiction over the Plaintiff's state law causes of action pursuant to § 1367(c).  Plaintiff's state law claims are accordingly DISMISSED without prejudice.

### B.  *Plaintiff's Motion for Leave to Amend*

Plaintiff requests leave to file an amended complaint in the event that I grant Defendants' motions to dismiss.  (Pl.'s Opp. Mem. 28.)

Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend a complaint "shall be freely given when justice so requires."  Courts permit amendment when "(1) the party seeking the amendment has not unduly delayed, (2) when that party is not acting in bad faith or with a dilatory motive, (3) when the opposing party will not be unduly prejudiced by the amendment, and (4) when the amendment is not futile."  *E*Trade Fin. Corp. v. Deutsche Bank AG*, 420 F. Supp. 2d 273, 282 (S.D.N.Y. 2006); *see also Mackensworth v. S.S. Am. Merchant,* 28 F.3d 246, 251 (2d Cir. 1994) (noting that undue delay, bad faith, or futility of an amendment are valid grounds for denying leave to amend).  "Amendment is futile if the proposed amended

complaint could not survive a motion to dismiss." *Soroof Trading Dev. Co. v. GE Microgen, Inc*., 283 F.R.D. 142, 147 (S.D.N.Y. 2012) (citing *Ricciuti v. New York City Transit Authority*, 941 F.2d 119, 123 (2d Cir.1991)).

"In the absence of any identification of how a further amendment would improve upon the Complaint, leave to amend must be denied as futile." *Lopez v. Ctpartners Exec. Search Inc*., 173 F. Supp. 3d 12, 44 (S.D.N.Y. 2016) (quoting *In re WorldCom, Inc. Sec. Litig*., 303 F.Supp.2d 385, 391 (S.D.N.Y. 2004)); *see also Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (denying as futile a request to replead where the problem with the cause of action was "substantive" rather than the result of "inartful[]" pleading, and the movant suggested "no new material" to be plead).  Generally, then, "[i]n order to meet the requirements of particularity in a motion to amend, 'a complete copy of the proposed amended complaint must accompany the motion so that both the Court and opposing parties can understand the exact changes sought.'" *Zito v. Leasecomm Corp.,* No. 02 Civ. 8072(GEL), 2004 WL 2211650, at *25 (S.D.N.Y. Sept. 30, 2004) (quoting *Smith v. Planas,* 151 F.R.D. 547, 550 (S.D.N.Y. 1993)).  However, the failure to file a proposed amended complaint "is not fatal where there is no undue prejudice to defendant."  *Fei v. WestLB AG,* No. 07 Civ. 8785(HB), 2008 WL 594768, at *2 (S.D.N.Y. Mar. 5, 2008).  Leave to amend may thus be granted notwithstanding a movant's failure to attach a proposed amended complaint if the movant provides the basis for the proposed amendments. *See, e.g*., *Segatt v. GSI Holding Corp*., No. 07 CIV.11413 (WHP), 2008 WL 4865033, at *4 (S.D.N.Y. Nov. 3, 2008) (granting leave to amend where the movant's papers adequately explained the basis for, and nature of, the proposed amendment); *Murray v. New York*, 604 F. Supp. 2d 581, 588 (W.D.N.Y. 2009) (same); *cf. La Barbera v. Ferran Enterprises*, Inc., No. CIV.A. 06-2678, 2009 WL 367611, at *3 (E.D.N.Y. Feb. 10, 2009) (denying motion for leave to

amend where "Plaintiffs' papers provide[d] no clarification as to exactly what changes are sought").  Where proposed amendments are not attached to a motion for leave to amend, a court may deny such motion without prejudice to refile accompanied by a proposed amended complaint.  *See, e.g.*, *Weaver v. IndyMac Fed. Bank, FSB*, No. 09-CV-5091 (LAP), 2019 WL 4563893, at *3 (S.D.N.Y. Sept. 9, 2019) (stating that the plaintiff's motion for leave to amend was denied "without prejudice to its refiling accompanied by a proposed amended complaint" on the basis that "Plaintiff did not submit a proposed amended complaint with that motion"); *Johnson v. Monsanto Chem. Co*., 129 F. Supp. 2d 189 (N.D.N.Y. 2001) (denying motion for leave to amend without prejudice to refile, where plaintiffs had not attached a proposed amended complaint to their motion).

As discussed above, Plaintiff fails to state a claim under the DTSA.  Faced with this substantive defect, Plaintiff has made no indication of how it plans to address the issues raised in Defendants' motions to dismiss.  Plaintiff has not attached a copy of its proposed amendments so that I and Defendants could evaluate the propriety or futility of the suggested changes.  Nor do Plaintiff's pleadings give any indication of the character of Plaintiff's intended amendments.  As Plaintiff has provided no insight into the nature of the proposed amendments despite having ample opportunity to do so in its opposition papers, granting Plaintiff an opportunity to amend the complaint at this juncture would be unduly prejudicial to Defendants.  Accordingly, Plaintiff's motion for leave to amend is DENIED without prejudice to refile if it demonstrates good cause for its failure to amend when it received the motion and its failure to include a proposed amended complaint.

### C. *Plaintiff's Motion for Reconsideration*

Plaintiff seeks reconsideration of Judge Rakoff's denial of Plaintiff's preliminary

injunction which sought to enjoin Defendants' use of 24 Seven's putative trade secrets and

solicitation of 24 Seven's clients, and to enforce the post-employment restrictions in 24 Seven's

Covenant with Martinez.

Regarding Plaintiff's DTSA claim, Judge Rakoff declined to enter a preliminary

injunction on the basis that Plaintiff did not demonstrate a likelihood of success on the merits.

*See JBR, Inc. v. Keurig Green Mountain, Inc*., 618 F. App'x 31, 33 (2d Cir. 2015) (stating that a

movant for a preliminary injunction must show "(1) likelihood of success on the merits; (2)

likelihood that the moving party will suffer irreparable harm if a preliminary injunction is not

granted; (3) that the balance of hardships tips in the moving party's favor; and (4) that the public

interest is not disserved by relief").  Specifically, Judge Rakoff held that Plaintiff failed to make

a sufficiently particularized showing that the information allegedly taken by Martinez was

protected as a trade secret, since several categories of information appeared "very likely to be

publicly available."  (Doc. 22, at 2–3.)

With regard to Plaintiff's application to enforce the post-employment restrictions in 24

Seven's Covenant against Defendant Martinez, Judge Rakoff applied the three-pronged test that

New York courts use in assessing the propriety of a non-compete agreement.  Under this test,

"[a] restraint is reasonable only if it:  (1) is no greater than is required for the protection of the

legitimate interest of the employer, (2) does not impose undue hardship on the employee, and (3)

is not injurious to the public."  *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 388–89 (1999).  "A

violation of any prong renders the covenant invalid."  *Id.* at 389.  "[T]he cognizable employer

interests under the first prong" are limited to "the protection against misappropriation of the

employer's trade secrets or of confidential customer lists, or protection from competition by a former employee whose services are unique or extraordinary." *Id.*  Judge Rakoff held that Plaintiff did not assert that Defendant Martinez's services were unique or extraordinary, or that trade secrets were at issue.  (Doc. 22, at 3.)  Additionally, Judge Rakoff remarked that the noncompete provision was "geographically broad" in that it prevented Defendant Martinez from "servic[ing] national accounts within" New York, New Jersey, and Connecticut, effectively prohibiting her from working with "many of the biggest clients in her industry."  (*Id*. at 4.)  Judge Rakoff thus determined that, even if trade secrets were at issue, Plaintiff had not demonstrated that the burdens imposed by the non-compete provision were no greater than required to protect Plaintiff's legitimate interests.  (*Id*.)

Plaintiff argues that Judge Rakoff erred in denying Plaintiff's motion for a preliminary injunction without an evidentiary hearing and that the August 19 Order failed to consider relevant facts and misapprehended the law.  (Pl.'s Recons. Mem. 1.)   First, Plaintiff claims that Judge Rakoff erred in concluding 24 Seven's information did not constitute trade secrets under the DTSA and, second, that Judge Rakoff erred in concluding that 24 Seven did not demonstrate a likelihood of success on the merits of its breach of contract claim.  (*Id*. at 6, 10.)  Accordingly, Plaintiff moves the Court to reconsider the August 19 Order pursuant to Fed. R. Civ. P. 59(e) and Local Rule 6.3.  Plaintiff also seeks reargument and an order for an evidentiary hearing.  (*Id*. at 1.)

Plaintiff does not point to an "intervening change of controlling law" or the "availability of new evidence" since the August 19 Order.  *Beacon*, 818 F. Supp. at 702–03.  Therefore, the Plaintiff's motion may only be granted if there is a "need to correct a clear error."  *Id*.

### 1.  Plaintiff's Request for an Evidentiary Hearing

Plaintiff submits that "[o]n the day of preliminary injunction hearing, the court did not conduct an evidentiary hearing and instead heard only conflicting oral argument by counsel." (Pl.'s Recons. Mem. 4.)  Plaintiff claims that, as a result, it was not given the opportunity to place its witnesses on the stand and "put on testimony to create a record that would have satisfied its burden." (*Id.*)  Plaintiff thus asserts that the August 19 Order was "not based on testimony or credibility, ignored the contents of the moving papers and deprived 24 Seven of the opportunity to present evidence that both is compelling and dispositive." (*Id.*)  As such, Plaintiff concludes that this Court "overlooked factual matters as applied to controlling decisions." (*Id.* at 6.)

As an initial matter, Plaintiff does not explain how the preliminary injunction hearing held on August 16, 2019 failed to fulfil the function of an evidentiary hearing, or that Plaintiff sought leave to put its witnesses on stand and was prevented from doing so.  In any event, "[a]n evidentiary hearing is not required when the relevant facts either are not in dispute or have been clearly demonstrated at prior stages of the case . . . or when the disputed facts are amenable to complete resolution on a paper record." *Charette v. Town of Oyster Bay*, 159 F.3d 749, 755 (2d Cir. 1998) (internal citations omitted); *see also Republic of Philippines v. New York Land Co.*, 852 F.2d 33, 37 (2d Cir. 1988) (noting that oral testimony was not required on a motion for a preliminary injunction where the "most significant factors" would have "remained essentially unchanged by any additional evidence").  Plaintiff does not contend there are any factual disputes, and Judge Rakoff's Order makes no reference to conflicting matters of fact.  Nor does Plaintiff explain how additional oral testimony by its witnesses or additional information that might be gleaned from an evidentiary hearing would materially change the record before me.  In fact, as discussed below, all of the factual allegations that Plaintiff claims that Judge Rakoff

overlooked are set forth in Plaintiff's pleadings supporting its motion for a preliminary

injunction.  As the comprehensive paper record and the transcript of the hearing on Plaintiff's

application for a preliminary injunction provide a sufficient basis for Judge Rakoff's Order and

for my factual findings in this Opinion & Order, Plaintiff's application for a further evidentiary

hearing is denied.

### 2.   Plaintiff's Claim that the August 19 Order Misapprehended Controlling Facts and Law

Plaintiff claims that Judge Rakoff overlooked the following allegations in Ms. Gudas's

Affidavit:

1.  That on September 13, 2018, Martinez sent to her Gmail account without authorization a highly confidential commission statement that contained client names, candidate names, billing hours billed by candidate by client, margin percentages, key client contacts, revenues by client, and commission amounts - all information that would be highly valuable to a competitor and which would allow a competitor in possession of such information to unfairly compete with 24 Seven.  Essential information that has taken us years to develop, including who to contact, what we can charge, what margins allow us to both compete and to generate a profit, how much business we do with a given client, and the keys to our inventory.  Gudas Aff. **Exhibit 1**.  This material has not been returned.

2.  On March 7, 2019, Martinez sent to her Gmail account information about her top 10 accounts, her account list and information about their staffing.  Gudas Aff. **Exhibit 6**. We further know that Martinez sent 24 Seven's training materials to her Gmail account.  *Id*. **Exhibit 9**.

3.  Martinez had no legitimate business reason to send any 24 Seven information, proprietary or otherwise, to her personal Gmail account.  Not only was Martinez provided a work laptop to work remotely, but she also had remote system access from any home computers she elected to use.  The materials sent to her Gmail account have not been returned.

4.  In June 2019, the month preceding her resignation, Martinez apparently for the first time, engaged in systematic review of Bullhorn customer records and that her examination concentrated on clients and industries that she did not service or have familiarity with during her tenure at 24 Seven.  Thus, there was no legitimate purpose for her review except to gather confidential account information via handwritten notes, or perhaps by taking screenshots with her

cellphone, that would be of value to her new employer, defendant Agency Worx.

5. The 24 Seven clients that Martinez viewed on Bullhorn in the month of June 2019 included a number of the largest advertising and media agencies such as Interpublic Group (IPG), Dentsu, EBellweather, Case, Creative Media Marketing, Digital Pulp, Echo Design and others. Martinez did not service the advertising industry, but her new colleagues at Agency Worx do. Attached as an exhibit is the Bullhorn screen shot from her IPG review. It shows prior contacts, key customer contact, and the temp jobs filled by 24 Seven. Gudas Aff. **Exhibits 7 and 8**. She also looked at beauty companies, such as E.L.F. cosmetics, Kiehl's, and Diptyque US. Martinez was not assigned to service beauty companies at 24 Seven and did not do so. Thus, she had no legitimate business reason to be looking at 24 Seven beauty sector clients, nor those in the advertising space.

6. That Martinez has breached the non-solicitation portion of her agreement by directly reaching out to a key Company client, Intermix, which is a subsidiary of the Gap.

(Pl.'s Recons. Mem. 7–8.) Plaintiff also asserts that Judge Rakoff "failed to . . . appreciate the documentary evidence attached as exhibits to the Gudas Affidavit." (*Id*. at 9.) Plaintiff reiterates that "[a]ll of the information above constitute trade secrets under the DTSA" and claims that Judge Rakoff overlooked these six items in denying Plaintiff relief. (*Id*. at 8–9.)

As discussed in fuller detail above, *supra* Part IV.A.1, having assessed the aforementioned allegations and accompanying exhibits, I find that Plaintiff has not stated a claim that any of the above items contains information that could be considered a trade secret under the DTSA. Having decided that Plaintiff's claims do not withstand Defendants' motions to dismiss, it stands to reason that Plaintiff also fails the more stringent standard applicable to a party seeking a preliminary injunction. Nor do any of the cases that Plaintiff cites in its motion for reconsideration militate in favor of a different outcome. In *AUA Private Equity Partners, LLC v. Soto*, unlike here, the question of whether the plaintiff sufficiently plead a trade secret was not in dispute. No. 1:17-CV-8035-GHW, 2018 WL 1684339, at *4 (S.D.N.Y. Apr. 5, 2018). The New

York state court decisions that Plaintiff cites for its proposition that nonpublic compilations of customer information and pricing data constitute trade secrets also do not alter either Judge Rakoff's or my determination, as Plaintiff has not in fact shown that its information was unavailable to the public.  *See Haber,* 188 F.3d at 44; *Eastern Bus. Sys., Inc.* v. *Specialty Bus. Solutions,* 292 A.D.2d 336, 338 (2d Dept. 2002); *Ashland*, 82 N.Y.2d at 407.  As such, it cannot be said that Judge Rakoff departed from applicable case law or overlooked "factual matters that were put before [him] on the underlying motion."  *Lichtenberg*, 28 F. App'x at 75.

With respect to the enforcement of the non-compete provisions of the Covenant, Plaintiff's sole contention is that "[t]he court's conclusion that enforcement is likely not warranted because plaintiff is not 'unique' misreads the case law and the fact that Martinez's relationships with 24 Seven's customers are unique and thus that element is satisfied."  (Pl.'s Recons. Mem. 11.)  In support of this argument, Plaintiff directs me to cases standing for the proposition that "[a]n employer has sufficient interest in retaining present customers to support an employee covenant where the employee's relationship with the customers is such that there is a substantial risk that the employee may be able to divert all or part of the business."  *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 72 (2d Cir. 1999); *see also Uniform Rental Div., Inc. v. Moreno*, 441 N.Y.S.2d 538 (2d Dept. 1981) (enforcing a noncompete agreement on the basis the that former employee was the "star" salesperson of the former employer); *Maltby v. Harlow Meyer Savage, Inc*., 633 N.Y.S.2d 926 (N.Y. Sup. Ct. 1995), *aff'd*, 637 N.Y.S.2d 110 (1st Dept. 1996) (granting a preliminary injunction on the basis that the former employees had unique relationships with customers that were developed at the former employer's expense).

As a preliminary matter, I note that Plaintiff fails to demonstrate that "there is a substantial risk" that Martinez alone would be able to "divert all or part of [its] business."

*Cohen*, 173 F.3d at 72.  Although Plaintiff claims in its reply memorandum that "24 Seven's client development/client relationship staff . . . are trained and supported to establish strong relationships with 24 Seven's clients" and that "[m]any of those relationships have taken years to form and have involved significant investment, both financially, and through time and effort, by 24 Seven," (Doc. 26, at 2), Plaintiff fails to identify specific facts demonstrating that this statement applies to Martinez, or to the particular clients she was prohibited from contacting by the noncompete provision.  In fact, Plaintiff's admission that national staffing firms like 24 Seven sometimes "share large clients who either prefer not to rely on one firm or whose needs are too great and diverse to be serviced by one staffing provider," (*id*.), belies its argument that Martinez would divert 24 Seven's business by contacting such large national clients who have nonexclusive relationships with staffing agencies—the very subset of clients that would be targeted by 24 Seven's noncompete provision, (*see* Gudas Aff. Ex. 4, at ¶¶ 2–4).

Regardless, assuming without deciding that Martinez's services were "unique," Plaintiff's contention does not undermine the other independent basis for Judge Rakoff's denial. As Judge Rakoff's Order alludes to, "non-compete clauses and nonsolicitation provisions, even where protecting legitimate interests, must be reasonably limited both temporally and geographically in order to withstand judicial scrutiny, as reasonableness will not be found where restrictive covenants act to unreasonably limit trade and burden an individual's livelihood." *Poller*, 974 F. Supp. 2d at 221.  As such, even where an employer has been determined to have an interest in preventing a former employee with "unique or extraordinary" abilities from exploiting goodwill at the employer's expense, this employer interest "will not be construed as legitimate if the covenant 'seeks to bar the employee from soliciting or providing services to clients with whom the employee never acquired a relationship through his or her employment or

if the covenant extends to personal clients recruited through the employee's independent effort.'"

*Poller*, 974 F. Supp. 2d at 216–17 (quoting *Scott, Stackrow & Co., C.P.A.'s, P.C. v. Skavina,* 780

N.Y.S. 2d 675 (3d Dep't 2004)); *see also Hirshberg*, 93 N.Y.2d at 393 (stating that the plaintiff

did not have a reasonable interest in extending a restrictive covenant to "personal clients of

defendant who came to the firm solely to avail themselves of his services and only as a result of

his own independent recruitment efforts").

In light of these considerations, Judge Rakoff's assessment that 24 Seven's restrictive

covenant was likely overbroad in seeking to enjoin Martinez from servicing "national accounts

or accounts within the New York metropolitan area" was not unreasonable.  Plaintiff's

noncompete provision does not merely prohibit Martinez from soliciting clients that she built

goodwill with through 24 Seven's resources, but, as Judge Rakoff points out, extends to "many

of the biggest clients in her industry."  (Doc. 22, at 4.)  Plaintiff has not asserted, nor can it

plausibly assert, that Martinez's relationships with any or all of these clients, present and future,

necessarily arise through Martinez's employment with 24 Seven, rather than her independent

efforts.  As Defendants point out, the key contacts for many of these clients may be obtained

through independent research.  (*See* H'rg Tr. 39:7–12.)  Plaintiff has not rebutted Martinez's

testimony that she had not, during the relevant time period considered by the noncompete

provision, actually contacted or solicited any candidates whose identities she learned from 24

Seven, other than a large national retailer who has an existing contract with Agency Worx.

(Martinez Aff. ¶ 14.)   In fact, Martinez claims that her only contact with a past client from

Intermix arose because that client contacted her after she sent a general announcement of her

new affiliation with Agency Worx through Agency Worx's contact list and contacts that she

"compiled through publicly available sources, such as LinkedIn and Zoom Info."  (*Id.* at ¶ 15.)

In short, Plaintiff failed to indicate with any specificity, in its motion for a preliminary injunction, the clients that Plaintiff claims Martinez built a relationship with at its expense. Accordingly, Judge Rakoff did not err in concluding that the noncompete provision was overly broad in preventing Martinez from contacting any clients whatsoever with national accounts in the New York Metropolitan area.

As Plaintiff has not raised "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice" since Judge Rakoff's August 19 Order, *Beacon*, 818 F. Supp. at 702–03, Plaintiff's motion for reconsideration is hereby DENIED.

## V.   <u>Conclusion</u>

For the foregoing reasons, Defendants' motions to dismiss are GRANTED.  Plaintiff's state law claims are dismissed without prejudice to refiling in state court.  Plaintiff's motion for leave to amend the complaint is DENIED.  Plaintiff's motion for reconsideration is DENIED.

The Clerk of Court is respectfully directed to terminate the open motions at Documents 25, 27, and 30 and close the case.


SO ORDERED.

Dated: January 26, 2021
       New York, New York

Vernon S. Broderick
United States District Judge